## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHAEL MULLAUGH<br>as Personal Representative of the<br>ESTATE OF MICHAEL A. LORIG,<br><br>                Plaintiff,<br><br>   v.<br><br>J.P. MORGAN CHASE & CO.,<br>J.P. MORGAN CHASE BANK, N.A,<br>J.P. MORGAN SECURITIES LLC, and<br>MICHAEL S. LEE in his individual and<br>professional capacities,<br><br>               Defendants. | **COMPLAINT AND JURY DEMAND**<br><br>Index No. |

Plaintiff Michael Mullaugh, in his capacity as Personal Representative of the Estate of Michael A. Lorig, by and through his undersigned counsel, states upon information and belief as follows:

## **INTRODUCTION**

1.    This is an action for damages arising from a continuous course of illegal and tortious conduct by the Defendants against Mr. Lorig that ultimately, directly, and proximately resulted in Mr. Lorig's death.

2.    Mr. Lorig was a tremendously successful broker, who had risen to great professional heights in decades of work at The Bear Stearns Companies ("Bear Stearns"). His success is even more poignant in considering the severe mental health issues he struggled with for most of his adult life.

3.    Following the collapse of Bear Stearns in the wake of the 2008 financial crisis, Mr. Lorig joined Defendant J.P. Morgan Chase & Co., who had acquired most of Bear Stearns's

business.  As set forth in paragraph 30 herein, J.P. Morgan Chase & Co. and its affiliated entities and subsidiaries named as defendants herein are referred to collectively as "JPMorgan."

4.      Though eager to acquire Mr. Lorig's book of business, the Defendants soon found that they preferred to cast aside an employee they regarded as too old and too disabled to remain with the firm.

5.      The Defendants knew, or deliberately, recklessly, or negligently ignored the fact that Mr. Lorig had a history of severe depression and anxiety.  On two prior occasions, in 1989 and 2001, Mr. Lorig had taken leaves of absence from work to treat his illness.

6.      In February 2014, Mr. Lorig became afflicted again with a bout of severe depression accompanied by anxiety, in which, among other things, Mr. Lorig frequently thought about committing suicide.

7.      The Defendants were aware of the challenges Mr. Lorig faced, because, as detailed herein, they received repeated detailed medical updates from Mr. Lorig's health care professionals explicitly informing them of his health care issues and suicidal ideation.

8.      When Mr. Lorig realized that he needed longer-term disability leave, the Defendants, led by Mr. Lorig's supervisor, Defendant Michael S. Lee, pounced.

9.      Aware that Mr. Lorig needed to focus on recovering to health, the Defendants instead unfairly and illegally pressured him to voluntarily retire rather than take long-term disability leave.  The Defendants also pressed him to accept a grossly deficient retirement "package", one which did not even correctly calculate outstanding loan balances the Defendants claimed Mr. Lorig owed them.

10.     The Defendants also, without Mr. Lorig's consent, permanently re-assigned his accounts to younger brokers.

11.     When Mr. Lorig refused to accept the Defendants' proposal, they quietly and spitefully terminated his professional licenses, triggering a ticking two-year clock that required Mr. Lorig to re-associate his licenses with another firm lest they expire.  As the Defendants were well aware, if Mr. Lorig's licenses expired, he would be required to sit for multiple state exams in order to restore them.

12.     The Defendants never even informed Mr. Lorig that they were treating his leave as eligible leave under the FMLA, but nevertheless retaliated against him for having the temerity to seek health care treatment rather than retire on terms the Defendants sought to dictate.

13.     Furthermore, the official forms that the Defendants filed with FINRA, and all other Self-Regulatory Organizations and jurisdictions where Mr. Lorig was licensed to do business, did not explain that Mr. Lorig was on disability leave.  Had the Defendants informed regulators that Mr. Lorig was on disability leave, JPMorgan's compliance departments doubtlessly would have informed them that Mr. Lorig should have been treated as "registered but inactive", instead of terminating his licenses.

14.     It was only after Mr. Lorig was finally cleared to return to work that the Defendants informed him that his position was no longer available, and that there was, purportedly, no work for him to return to.

15.     Moreover, Mr. Lorig now learned he only had weeks to attempt to re-associate his licenses.  He and his counsel begged the Defendants to file paperwork that made clear that his licenses were simply inactive, rather than terminated.

16.     The Defendants, however, maliciously and unreasonably rejected Mr. Lorig's requests.  Instead, they pressured him to sign a severance package that imposed extraordinarily

restrictive covenants upon him that would have effectively prohibited him from earning a living in his profession.

17.     In addition, the Defendants demanded that Mr. Lorig falsely characterize his exit as a "voluntary retirement" rather than a reduction-in-force, because the latter would have entitled Mr. Lorig to benefits and compensation the Defendants were not willing to provide to him.

18.     All the while, the clock kept ticking and ultimately expired on Mr. Lorig's licenses, which were the culmination of years of hard work on his part in the face of severe health issues.

19.     As detailed herein, faced with personal and professional devastation as a result of a deliberate, malicious, and continuous plan to rid JPMorgan of an older employee with a history of depression, Mr. Lorig took his own life on January 22, 2017.

20.     No lawsuit can ever truly compensate the Estate and its heirs for the devastation that the Defendants have inflicted upon them.  But, at a minimum, this lawsuit seeks to hold the Defendants accountable to this Court and the public for their reprehensible conduct, financially compensate the Estate and its beneficiaries for their immense losses, and help ensure that other employees avoid similar treatment.

**PARTIES**

21.     Plaintiff Michael Mullaugh was appointed as Personal Representative of the Estate of Michael A. Lorig, deceased.  Mr. Lorig resided in the State of Florida when he died on January 22, 2017.  Plaintiff brings this action in his capacity as legal representative of Mr. Lorig's Estate.

22.     Plaintiff was appointed personal representative of the Estate of Michael A. Lorig on February 28, 2018 by the Circuit Court for Collier County, Florida, Probate Division.  Attached as Exhibit "A" are the Letters of Administration appointing Plaintiff as Personal Representative.

Attached as Exhibit "B" is the Florida Court's February 28, 2018 Order revoking Letters of Administration issued for Mr. Lorig's Estate's prior Personal Representative, BNY Mellon, N.A.

23.     Mr. Lorig is survived by next of kin and distributees who lost the services, income, support and guidance of Mr. Lorig.

24.     Defendant J.P. Morgan Chase & Company ("JPMCC") is a Delaware corporation headquartered in New York, New York.  JPMCC is a global financial services firm and bank.

25.     Defendant J.P. Morgan Chase Bank N.A. ("JPMCB") is a wholly owned subsidiary of JPMCC, and is a nationally-chartered bank organized under the laws of the state of Ohio, maintaining principal offices in New York, New York.

26.     JPMCB acts as the investment manager and bank for "J.P. Morgan Private Bank" ("JPM Private Bank").  JPM Private Bank is the marketing name of a business unit within JPMCC providing banking and investment services in the U.S. to high net worth and ultra-high net worth customers.   JPM Private Bank provides brokerage services through Defendant J.P. Morgan Securities LLC.

27.      As alleged herein, Mr. Lorig's Form W-2 tax filings for years 2011-2013 were issued by JPMCB.

28.     Defendant J.P. Morgan Securities LLC ("JPMS") is a wholly-owned subsidiary of JPMorgan, and is a Delaware limited liability company headquartered in New York, New York. JPMS has registered with the U.S. Securities & Exchange Commission as a broker-dealer since 1985 and as an investment adviser since 1965.

29.     A Form U5 that the Defendants filed in 2014 terminating Mr. Lorig's licenses to trade securities (discussed in greater detail herein) states that Mr. Lorig was employed by JPMS.

30.     Defendants JPMCC (including its JPM Private Bank unit), JPMCB, and JPMS, are referred to herein collectively as "JPMorgan".

31.     Defendant Michael S. Lee ("Lee") is a Managing Director of JPMCC and Regional Director of JPMS.  On information and belief, Lee resides in New York.

32.     JPMorgan is both primarily liable and vicariously liable for the acts and omissions of its employees and agents, including Lee, by well-established legal principles including the doctrine of *respondeat superior*.

## JURISDICTION AND VENUE

33.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1332 as this action involves citizens of different states and the amount in controversy in this matter exceeds $75,000.

34.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to this Action, including the unlawful practices alleged herein, occurred in this District.

## FACTS

### Mr. Lorig's Personal and Educational Background

35.     Mr. Lorig was 66 years old when he died on January 22, 2017.  He was born in Chicago, Illinois on April 17, 1950.

36.     After graduating from high school in 1968, Mr. Lorig was awarded a wrestling scholarship by the University of Illinois, where he was recognized as a "Bronze Tablet" scholar, and from which he earned a Bachelor's of Science in 1972.

37.     After graduating from college, Mr. Lorig proceeded to earn an MBA from Dartmouth College's Amos Tuck School of Business.

38.     Later, from 2002 to 2011, Mr. Lorig served on the Tuck School's Board of Overseers.

39.     Furthermore, while he completed his education, and commenced his career in finance, Mr. Lorig served in the Illinois, New Hampshire, and New York national guards from 1970-1976.

40.     Throughout his entire life, Mr. Lorig was an avid athlete.  He competed as a varsity wrestler in high school and on the Division I level in college.

41.     Mr. Lorig also completed multiple marathons including Chicago, New York and Boston.  He loved playing golf and skiing.

**42.**     Mr. Lorig was also an enthusiastic cyclist, and spent numerous summers riding in the Pan Mass Challenge and RAGBRAI (an annual 500-mile bike ride across Iowa).  He also spent one summer riding his bicycle across the country from the Pacific Ocean to the Atlantic Ocean.

## Mr. Lorig's Professional Achievements

43.     Mr. Lorig commenced employment with Bear Stearns in September 1979, at which time he launched Bear Stearns' institutional financial futures business.

44.     Mr. Lorig remained at Bear Stearns until 2008 when, as explained below, Bear Stearns was acquired by and merged into JPMorgan.

45.     From 1979 to 1990 Mr. Lorig co-founded and ran sales for the Institutional Futures group with Edward DeMaria.

46.     In 1988, in recognition of his value and service to Bear Stearns, Mr. Lorig was promoted to Senior Managing Director.

47.     When Mr. DeMaria retired in 1990, Mr. Lorig continued to run sales for the group nationally.  Mr. Lorig was one of Bear Stearns's most successful salespersons during this period,

building the institutional financial futures business into a $70 million enterprise, while also covering prestigious institutional accounts for entities such as Harvard, Fidelity, Aetna, and Convexity.

48.     Until Bear Stearns' collapse in 2008, Mr. Lorig's group was Bear Stearns' Private Client Service division's ("PCS Division") second-largest grossing business, grossing more than $10 million annually.

49.     Within the PCS Division, Mr. Lorig reported to Barry Sommers, a Bear Stearns Senior Managing Director.

50.     For each year between 1987 through 2001 Mr. Lorig personally earned no less than $1 million.

51.     Mr. Lorig also earned no less than $1 million per year between 2001 and 2008, save for years 2002-2003, when he was being treated for his disability (addressed further below).

**Mr. Lorig Joins JPMorgan**

52.     When JPMorgan acquired Bear Stearns in 2008, JPMorgan wished to retain Mr. Lorig and his lucrative book of business.

53.     JPMorgan employed various methods to induce desirable Bear Stearns employees to join.  These methods included offering retention bonuses of varying values.

54.     JPMorgan also enforced Bear Stearns' restrictive covenants against employees JPMorgan wanted to retain who instead attempted to resign.

55.     In cases where JPMorgan did not want to retain a Bear Stearns employee, it typically provided severance packages which included a waiver of restrictive covenants, other than those which prohibited soliciting employees, payment of one month's salary per year of

employment up to one year of severance, vesting of the employee's stock options, and payment of a lump sum *pro rata* bonus for the completed year.

56.     To incentivize Mr. Lorig to remain at JPMorgan, JPMorgan offered him a compensation package of over $2.2 million.

57.     This package was presented as a combination of an up-front loan and stock awards that would be earned and paid in equal increments over seven (7) years.

58.     Also, on June 2, 2008, Mr. Lorig was awarded a retention grant of 13,284 JPMorgan restricted stock units ("RSU"), with 6,642 units to vest on July 25, 2012 and 6,642 units to vest on July 25, 2013.

59.     The share value at the time of the RSU grant was $42 per share.

60.     On June 11, 2008, JPMorgan distributed $1,682,244.24 in loan proceeds to Mr. Lorig, with annual repayment installments due on June 11 of 2009 through 2015.

61.     To earn these annual loan payments, a 20% hurdle level was established, meaning that every year, Mr. Lorig was required to gross 20% of approximately $2.2 million (constituting the combined total amount of his up-front cash loan and RSU stock awards).

62.     Mr. Lorig's title at JPMorgan was, as it had been at Bear Stearns, Senior Managing Director.

63.     After Mr. Lorig joined JPMorgan, his institutional business was taken away by JPMorgan and assigned to other brokers, even though Mr. Lorig's institutional clients requested his continued service.

64.     Despite the forced transfer of his institutional business, Mr. Lorig remained successful and was consistently a top 20% producer for JPMorgan in his division.

65.     When Mr. Lorig commenced working at JPMorgan, Barry Sommers remained his supervisor, and the two continued to enjoy a positive relationship.

66.     Later, Defendant Lee replaced Mr. Sommers as Mr. Lorig's direct supervisor.

67.     Mr. Lorig and Mr. Lee often had a strained relationship.   Although Mr. Lee acknowledged Mr. Lorig's success, knowledge, and acumen, Mr. Lee resented what he subjectively perceived as efforts by Mr. Lorig to address issues directly with more senior JPMorgan executives.

**Mr. Lorig Commences Short-Term Disability**
**Leave to Address Severe Mental Health Disabilities**

68.     Mr. Lorig's accomplishments were even more remarkable because for many years he suffered from clinically diagnosed, medically treated anxiety and depression.

69.     Defendants' business records document that in 1989 and 2001, Mr. Lorig needed to take two medical leaves of 6 months in both of those years to treat and recover from his mental health issues.

70.     On both occasions Mr. Lorig overcame his disability, and continued his successful career, generating substantial profits for his employer.

71.     Mr. Lorig's struggles with mental health issues were documented in a 2005 electronically-reported decision issued by the Superior Court of Connecticut entitled *Lorig v. Lorig* No. FSTFA040198713, 2005 WL 3693765, at *1 (Conn. Super. Ct. Dec. 27, 2005).   In that decision, concerning Mr. Lorig's divorce from his first wife, Eleanor Lorig, Judge Novak remarked:

> **The plaintiff ("husband") is 55 years old. He has been living with bipolar mood disorder for years but except for brief episodes he has not been prevented from leading a full, active and exciting life personally and professionally.** He is a graduate of the University of Illinois with a B.S. degree in finance and later obtained a MBA degree from the Amos Tuck School at Dartmouth. He has

10

**created a successful career in investment sales and trading and has been associated with Bear Stearns and Company in New York City for several years.**

72.    In late February 2014, Mr. Lorig suffered another bout of severe depression. Among other things, Mr. Lorig experienced acute suicidal ideation.

73.    To treat his condition, Mr. Lorig commenced short-term disability leave and took his first sick day on February 25, 2014.

74.    JPMorgan granted Mr. Lorig short-term disability leave.

75.    JPMorgan provides 25 weeks (6 months) of short-term disability leave.

76.    At all relevant times, Mr. Lorig consistently informed JPMorgan that, although he could not state with certainty when he would return to work, he nevertheless fully intended to return to his position.

77.    When Mr. Lorig commenced short-term disability leave, although he remained an employee, JPMorgan revoked his security access to the office building, cut-off his JPMorgan e-mail account access, and boxed up the personal items in Mr. Lorig's office and delivered them to him.

78.    At the time Mr. Lorig commenced short-term disability leave, the Defendants, including Defendant Lee, were fully aware of Mr. Lorig's health issues.

79.    At no relevant time was Mr. Lorig ever provided any materials under the FMLA, nor did anyone ever discuss the FMLA with him.

80.    Had Mr. Lorig's leave been considered FMLA leave, JPMorgan would have been required to provide Mr. Lorig specific notice pursuant to 25 C.F.R. §825.300, including the fact that JPMorgan would designate Mr. Lorig's short-term disability leave and count it against his annual FMLA leave entitlement.

11

81.     Furthermore, any such leave would have expired in approximately late May or early June of 2014 (approximately 12 weeks after Mr. Lorig commenced short-term disability leave), but, as discussed below, Defendants took other action well *after* this time.  These acts included terminating Mr. Lorig's professional licenses in September 2014 following his commencement of long-term disability leave the prior month.

82.     Mr. Lorig was treated for his illness by both a psychiatrist, Leonard Leven, M.D., and a psychoanalyst, George Chapar, Ph.D.

83.     On March 4, 2014, Dr. Leven transmitted a Short-Term Certification Mental Health Form to JPMorgan.

84.     In the certification, Dr. Leven informed the Defendants that Mr. Lorig had been diagnosed with both major depressive disorder and generalized anxiety disorder.

85.     Dr. Leven also stated that Mr. Lorig's symptoms drastically affected his ability to work, and expressly stated that Mr. Lorig often engaged in "***acute suicidal ideation***", and was unable to concentrate or properly process information.

86.     Dr. Leven also informed JPMorgan that he could not, at that time, estimate when Mr. Lorig would be able to return to work.

87.     Mr. Lorig continued treatment that summer, and Dr. Leven provided written updates to JPMorgan that restated his March 4, 2014 diagnosis and reiterated his assessment that he could not at that time determine when Mr. Lorig would be able to return to work.

**The Defendants Unilaterally Impose a Split of Commissions Upon Mr. Lorig**

88.     When Mr. Lorig commenced his short-term disability leave, Mr. Lee informed him that JPMorgan did not generally pay commissions to brokers, but that such payments instead would come out of the particular JPMorgan department's budget.

89.     Defendant Lee therefore unilaterally implemented a split of commissions.

90.     Although the accounts remained Mr. Lorig's accounts for the extent of his short-term disability leave, another broker in Mr. Lorig's division, Conrad Woo, was assigned to field calls and ensure that the transactions were executed.

91.     Under the regime Lee implemented, for the duration of Mr. Lorig's short-term disability leave, Mr. Lorig continued receiving a reduced percentage share of commissions on his book of business of approximately 20%, with the 80% balance paid to Mr. Woo.

92.     Mr. Lorig received credit for such commissions as late as August 2014.

93.     Later, when Mr. Lorig commenced long-term disability leave Defendant Lee unilaterally canceled the commission split going forward, and informed Mr. Lorig that JPMorgan would terminate his professional licenses.

94.     Mr. Lorig would also later learn, in 2016, that Mr. Lee had permanently transferred his accounts to other brokers.

**The Defendants Wrongfully Withhold Loan**
**Distribution Payments and Miscalculate the Loan Balance**

95.     JPMorgan also withheld Mr. Lorig's sixth loan distribution payment.

96.     JPMorgan had originally lent Mr. Lorig $1,682,244 to be paid in seven equal payments of $240,320.57 per year.

97.     Mr. Lorig's sixth loan year commenced in June 2013, *before* his short-term disability leave started.

98.     However, JPMorgan continued to pay Mr. Lorig on his production through August 2014.

99.     Mr. Lorig easily met the required 20% production hurdle (gross 20% of the total loan and RSU awards amount of approximately $2.2 million) for 2014.

100.    The sixth loan payment, which commenced in June 2013, was cleared *before* Mr. Lorig even started his short-term disability leave.

101.    As stated above, Mr. Lorig continued receiving a percentage of his commissions thereby reducing the loan through August 2014, when, as detailed further *infra*, he commenced long-term disability leave.

102.    JPMorgan, however claimed that Mr. Lorig owed a $587,000 loan balance, comprising of principal in the amount of $480,640 for years 6 and 7 of the loan, with the remaining approximately $107,000 constituting interest

103.    The outstanding loan balance JPMorgan claimed Mr. Lorig owed was excessive because JPMorgan improperly charged Mr. Lorig interest on the balance, and failed to account for the fact that Mr. Lorig had earned compensation through commission credits, and therefore cleared applicable hurdles that should have reduced the loan balance.

104.    Accordingly, as of January 2017, Mr. Lorig's outstanding loan balance should have been no more than approximately $240,000 in principal, and no more than half of the $107,000 (or approximately $53,500) JPMorgan included as interest.  This represents only the final year (or the seventh payment).

105.    Instead, the Defendants unnecessarily charged Mr. Lorig interest on his loan even though he had earned funds and cleared applicable hurdles for the sixth payment.

**Mr. Lorig Continues Treatment**

106.    Mr. Lorig continued treatment with his medical professionals, who in turn periodically updated Defendants regarding their patient's condition.

107.    On April 10, 2014, Dr. Leven and Dr. Chapar both executed a "Short-Term Mental Health Update Report" (a "Short-Term Update Report" or "Update"), which they faxed to

14

JPMorgan.  In their update, Mr. Lorig's doctors advised that "*Mr. Lorig is only capable of reading the newspaper and going for walks. He has insomnia, can't concentrate, is despondent, and has fleeting thoughts of suicide.*"

108.    The doctors also advised JPMorgan that Mr. Lorig's illness rendered him*, inter alia*, severely impaired in his ability to "*organize complex information*", "*learn and retain new information timely*", "*sustain realistic energy to follow through and complete tasks timely*", "*sustain thinking and focus in the face of the usual stresses*", "*take responsibility for solving routine work problems", "deal realistically with others errors and demands*", "*maintain performance in significant organizational stress/change*", "*effectively organize completion of multiple tasks at the same time*", and "*organize and manage projects and/or processes independently*."

109.    The Short-Term Update Report also revealed the Defendants' knowledge that employees on short-term disability leave to treat mental health issues might pose suicide risks. The Update expressly advised the health care professional filling out the Update that **"[i]f the employee is suicidal we require a safety plan."**

110.    In a June 10, 2014 Short-Term Update Report faxed to JPMorgan, Dr. Leven informed the Defendants that Mr. Lorig suffered from Major Depressive Disorder and Moderate Generalized Anxiety Disorder.

111.    In that Update, Dr. Leven advised that Mr. Lorig "*...has insomnia, can't concentrate, and in the morning is despondent with passive suicide thoughts*."

112.    In the June 10, 2014 Short-Term Update Report, Dr. Leven identified areas in which Mr. Lorig was severely or totally impaired.  Dr. Leven informed the Defendants that Mr.

Lorig suffered "*total impairment*" with respect to his ability to work on his own, and stated that Mr. Lorig was not capable of accepting responsibility for tasks in the workplace.

113.   In the June 10, 2014 Update, Dr. Leven stated that he could not estimate when Mr. Lorig could return to work.

114.   On June 24, 2014, Dr. Leven transmitted another Short-Term Update Report to Defendants.

115.   In the June 24, 2014 Update, Dr. Leven informed Defendants "*Mr. Lorig wakes up each morning with passive thoughts of suicide. He turns to his wife for comfort. He reads the paper, does chores around the house, and goes for walks. He can't concentrate on anything for very long.*"

116.   On July 9, 2014, JPMorgan's Human Resources Disability Management Services department sent Dr. Leven a fax asking him to provide Mr. Lorig's medical records, office visit notes, medication lists and clinical summaries.

117.   Dr. Leven complied with JPMorgan's requests, sending the records on July 20, 2014.  Dr. Leven's records documented Mr. Lorig's serious mental health issues.  The notes Dr. Leven faxed to JPMorgan advised:

   a.   On June 9, 2014, Mr. Lorig stated that he had "*suicidal thoughts in the a.m.*"

   b.   On June 23, 2014, Mr. Lorig advised Dr. Chapar that he engaged in suicidal ideation without a plan.

   c.   On July 9, 2014, Mr. Lorig stated that he was "*wakening with suicidal thoughts*" and advised that the only medication that seemed to assist was Ativan.

118.   In a July 26, 2014 attending physician statement provided to Prudential Insurance, which provided JPMorgan's disability management services, Dr. Leven advised that "*Mr. Lorig is suicidal from early in the morning for several hours after.*"

16

119.    At all relevant times, the Defendants were advised that Mr. Lorig and his medical team were working intensely so that Mr. Lorig could to return to health, and re-commence his job.

120.    During his short-term disability leave from February 2014 through August 2014, as well as during his long-term disability leave between August 2014 and July 2016, Mr. Lorig communicated with JPMorgan employees.

121.    FINRA rules and JPMorgan policies required Mr. Lorig to maintain his own personal accounts with JPMorgan, a situation that persisted when Mr. Lorig died because JPMorgan claimed he was still a JPMorgan employee.

122.    Conrad Woo was assigned the task of handling Mr. Lorig's personal accounts.

123.    To address questions regarding his personal accounts, Mr. Lorig communicated with Mr. Woo (often daily); several of these phone calls took place when Mr. Lorig was in Florida, and Mr. Woo was aware that Mr. Lorig was spending extended periods of time in Florida rather than New York City.

124.    On some occasions, Mr. Woo would also ask Mr. Lorig questions about the customer accounts Mr. Lorig had formerly handled, and which Mr. Woo had been assigned to administer during Mr. Lorig's absence.  Despite his disabling illness, Mr. Lorig did his best to respond to Mr. Woo's questions and assist him.

**The Defendants Pressure Mr. Lorig to Retire**
**Rather Than Take Further Disability Leave or Return to Work**

125.    In June 2014, Defendant Lee, aware of Mr. Lorig's mental health disability struggles, and knowing or deliberately, recklessly or negligently ignoring the likelihood that Mr. Lorig would also take long-term disability leave, urged Mr. Lorig to retire rather than take long-term disability leave.

126.    Specifically, in violation of Federal, State, and New York City law, Lee proposed that while Mr. Lorig remained on short-term disability, his loan repayment obligations would be frozen, and that the freeze would continue if Mr. Lorig's disability persisted.  Mr. Lee further proposed that any remaining unpaid balance on the loan be forgiven in exchange for Mr. Lorig retiring and transferring his business to Mr. Woo, rather than ever returning from disabled status.

127.    Not only did presenting these proposals violate multiple laws, but they failed to even address whether the "freeze" included a freeze on accumulated interest, or address whether during a freeze anything would be deducted from Mr. Lorig's accounts, or deposited into his accounts.

128.    Mr. Lorig declined to accept Mr. Lee's proposal, advising that he needed extended leave to treat his illness, and could not fairly evaluate the proposal, but stated that he had every intention of returning to work once he was healthy.

**Mr. Lorig Continues to Struggle with Mental Illness**

129.    Despite Mr. Lorig and his doctors' efforts, Mr. Lorig's health issues had not materially improved by August 2014.

130.    On August 10, 2014, Dr. Leven transmitted a letter to Prudential Insurance summarizing Mr. Lorig's condition.

131.    Dr. Leven stated that while Mr. Lorig was "*generally an upbeat, energetic, and very intelligent man*", in his adult life he had experienced "*several bouts of combined severe anxiety and depression. Several occurred before he entered treatment and they lasted considerable lengths of time.*"

132.    Dr. Leven's August 10 letter further stated that in February 2014, Mr. Lorig was "*extremely anxious and depressed and had fleeting thoughts of slitting his wrists*", observing that

18

this had occurred in the context of both marital stress and a re-examination of his life goals and achievements as he aged, and that "*because Wall Street was such a core part of his identity, in many ways he was lost, and in many ways this was an existential crisis.*"

133.   Dr. Leven further explained that despite interventions with medication, Mr. Lorig "*continues to have early morning awakening with feelings of dread and despair*" and had "*passive suicidal thoughts*".

134.   Dr. Leven also noted that although Mr. Lorig's symptoms abated as the day proceeded, such relief occurred in a "low stress environment."

135.   Dr. Leven concluded that while it was "*impossible to predict the course of Mr. Lorig's condition*" he and Dr. Chapar were "*...all striving to return [Mr. Lorig] to his pre-February state as soon as possible.*"

**Mr. Lorig Commences Long-Term Disability Leave,**
**and Defendants Continue Pressuring Him to Retire**

136.   On August 15, 2014, Mr. Lorig commenced long-term disability leave.

137.   In order to commence long-term disability leave, Mr. Lorig filled out forms at the request of Prudential Insurance, which had, at JPMorgan's direction, taken responsibility for Mr. Lorig's case.

138.   Prudential Insurance granted and paid for Mr. Lorig's long-term disability leave.

139.   As had been the case for his short-term disability leave, Mr. Lorig made clear to the Defendants that, although he could not predict when, it was his full intention to treat his disability and return to work.

140.   The Defendants, including Mr. Lee, knew that Mr. Lorig was commencing long-term disability leave due to his continuing mental health treatment issues.

141.    Despite that knowledge, the Defendants continued improperly pressuring Mr. Lorig to voluntarily retire rather than return to work.

142.    In August 2014, Mr. Lee insisted that Mr. Lorig meet with him at the InterContinental Hotel in New York City.

143.    Mr. Lorig, although far from being in any condition to properly evaluate and consider any work-related matters, including his future employment, agreed to meet with Mr. Lee.

144.    At the meeting, Mr. Lee advised Mr. Lorig that, rather than return to work from his disabled status, Mr. Lorig should instead voluntarily retire and transfer his business to Mr. Woo.

145.    Mr. Lee further advised Mr. Lorig that if he agreed to voluntarily retire and transfer his business to Mr. Woo, JPMorgan would, in exchange, forgive Mr. Lorig's loan balance, and would fully vest Mr. Lorig in his RSU.

146.    At the August 2014 meeting, Mr. Lee also acknowledged that Mr. Lorig had satisfied loan forgiveness hurdle requirements for year six of the loan.

147.    Mr. Lee presented this proposal on the Defendants' behalf at a time when he and JPMorgan were fully aware of Mr. Lorig's disability and stated intention to recover and return to work.

148.    Mr. Lee never presented JPMorgan's "proposal" in a written offer.

149.    JPMorgan's proposed retirement "deal" communicated by Mr. Lee would have eliminated the standard retirement packages JPMorgan offered to employees similarly situated to Mr. Lorig, including offering retiring brokers the opportunity to transfer their book of business to a remaining JPMorgan broker of their choice and, in exchange, receive a percentage of trailing commissions for a three year period as follows: 50-60% of gross production the first year of retirement; 40-50% the second year of retirement, and 30-40% the third year of retirement.

150.     Mr. Lorig did not accept JPMorgan's proposal.

151.     Mr. Lorig explained to Mr. Lee that he needed to focus on recovering from his illness, making clear that he was not positioned to consider any such proposal at that time.

152.     Mr. Lorig also, again, reiterated to Mr. Lee his intention to return to work once he had recovered.

**The Defendants Improperly and Maliciously
Terminate Mr. Lorig's Professional Licenses**

153.     Shortly after his meeting with Mr. Lorig at the InterContinental Hotel, Mr. Lee telephoned Mr. Lorig, and informed him that JPMorgan's compliance division intended to terminate Mr. Lorig's professional licenses.

154.     Mr. Lorig, in the midst of attempting to address his severe, disabling clinical depression and anxiety, and unable to genuinely grasp the implications of this decision, asked Mr. Lee what he expected him to do.

155.     Mr. Lee did not answer Mr. Lorig's question.   Mr. Lee instead reiterated his "recommendation" that Mr. Lorig voluntarily retire.

156.     On September 19, 2014, JPMorgan filed a Form U5 with the Financial Industry Regulatory Authority ("FINRA") for Mr. Lorig.

157.     The Form U5 was signed by JPMorgan compliance department employee Deborah Barrigan.

158.     That same day, JPMorgan terminated Mr. Lorig's state licensing registrations.

159.     The Form U5 stated it was a full termination, effective September 17, 2014.

160.     The Form U5 terminated all securities and futures licenses issued by FINRA, the National Futures Administration ("NFA"), and state securities licensing authorities.

161.   At the time the Form U5 was filed, Mr. Lorig had not been terminated from JPMorgan, and he had not retired from JPMorgan.  He was on approved long-term disability leave.

162.   JPMorgan did not inform Mr. Lorig that the Form U5 had been filed until October 3, 2014, when Ms. Barragan sent, as required under FINRA rules, a letter to Mr. Lorig's New York City residence, attaching a copy of the filed Form U5.

163.   Despite knowing of Mr. Lorig's health issues, including Dr. Leven's March 4 correspondence that detailed Mr. Lorig's difficulties in processing information and concentrating, the Defendants made no effort to discuss the reasons for the professional license termination, or why - as detailed below - the Form U5 stated that "personal leave" was the triggering event for the termination.

164.   As detailed above, JPMorgan had seen fit to telephone Mr. Lorig when Mr. Woo had questions regarding business, or when Mr. Lee asked him to meet in person to propose a retirement plan.  But JPMorgan made no effort to follow up with Mr. Lorig regarding his impending license expiration after sending him the October 3, 2014 letter, or even to confirm that he had received Ms. Barragan's October 3 letter.

165.   The Defendants' failure is even more inexcusable because not only were the Defendants aware of Mr. Lorig's disability, they also knew (through JPMorgan employee Mr. Woo) that Mr. Lorig was spending considerable amounts of time in Florida both when the Form U5 was filed, and when it was sent to his New York residence on October 3, 2014.

166.   Before filing the Form U5, JPMorgan did not interact or attempt to interact with Mr. Lorig to assess his possible return to work, or explore available accommodations.

167.   Furthermore, no JPMorgan compliance employees ever contacted Mr. Lorig to advise that his Continuing Education ("CE") compliance had lapsed.

168.    In fact, as of the date the Form U5 was filed – September 19, 2014 – Mr. Lorig's CE had <u>not</u> lapsed.

169.    Even if Mr. Lorig's CE had expired, FINRA Rule 1250(a)(2) provides that a license should merely be rendered *inactive*, not *terminated*, in order to allow a registered representative to cure defects in CE credits.

170.    JPMorgan could have informed FINRA that Mr. Lorig was "registered but inactive" rather than filing a Form U5 stating that he had been terminated and that his licenses were terminated.  JP Morgan did not do so.

171.    Financial services firms commonly list an employee as "registered when inactive" pending completion of necessary CE credits, including in situations where an employee is performing military service, or when an employee is inactive, but not terminated.

172.    For example, February 2006 guidance published by FINRA,[1] explains that formal amendments to NASD Interpretative Materials filed with the Securities & Exchange Commission in November 2005 permit *"... a firm to place a registered representative on "inactive" status while serving in the Armed Forces of the United States*."

173.    The NASD February 2006 guidance further explained that "*such "inactive" status excuses a registered representative from continuing education obligations, waives dues and assessments, and ensures that he or she is not subject to the two-year expiration period for securities licenses of persons who cease to be registered with a member (two-year licensing expiration provisions)*."

174.    The Form U5 provided four choices for the reason behind the termination: "**Voluntary**", "**Permitted to Resign**", "**Termination**", and "**Other**".

---

[1] Available at https://www.finra.org/sites/default/files/NoticeDocument/p016053.pdf

175.    JPMorgan selected "**Other**", which as the Defendants knew, or were reckless or negligent in not knowing, requires a firm to provide an explanation for the termination.

176.    JPMorgan stated on the Form U5 that the licenses had been terminated because Mr. Lorig was supposedly an "*employee on leave of absence, not client or sales practice related.*"

177.    The Form U5 does not indicate that Mr. Lorig was on disability leave, even though JPMorgan had regularly received and possessed multiple written communications from Mr. Lorig's medical providers informing and updating them on his illness and status.

178.    JPMorgan engaged in no reasonable efforts to interact with Mr. Lorig regarding a potential return to work, or reasonable accommodations for that return.

179.    The Equal Employment Opportunity Commission ("EEOC") has made clear its expectations that employers are to interact with employees suffering from mental health conditions to explore reasonable accommodation.

180.    The EEOC reinforced such expectations as recently as December 12, 2016.  *See Depression, PTSD, & Other Mental Health Conditions in the Workplace: Your Legal Rights*, available at https://www.eeoc.gov/eeoc/publications/mental_health.cfm.  The EEOC in fact issued a press release announcing the publication's release.  *See EEOC Issues Publication on the Rights of Job Applicants and Employees with Mental Health Conditions*, available at https://www.eeoc.gov/eeoc/newsroom/release/12-12-16a.cfm.

181.    Had the Form U5 listed "disability leave" as the triggering event, JPMorgan's compliance department would have been notified, and FINRA likely would have advised that the licenses should not have been terminated, but instead only rendered inactive.

182.    Once a Form U5 termination notice is filed, a registered person has up to two years to re-establish their license by re-affiliating with the same or a different employer.

183.   As the Defendants knew, deliberately ignored, or recklessly or negligently failed to know, if re-affiliation does not occur, the licenses are generally perceived as irrevocably lost absent new testing.

184.   The Defendants also knew that the testing process is extremely arduous, and involves separate tests for the Series 3, Series 7, Series 63, Series 55, AMEX PC, and state securities licenses.

185.   The state securities licenses also require burdensome stand-alone applications on a state-by-state basis.

186.   Had Mr. Lorig not been suffering from his serious mental illness and been able to more fully process matters, he would have comprehended the enormity and gravity of the radical action taken by the Defendants.

187.   Had Mr. Lorig not been suffering from his serious mental illness and been able to more fully process matters he also would have recognized that he had only two years to re-associate with another firm to avoid having his professional licenses expire.

188.   Importantly, JPMorgan filed the Form U5 such that the date that Mr. Lorig's licenses would expire would be: (a) just shy of the date Mr. Lorig was required to return to work under JPMorgan's long-term disability plan, and (b) within the time period that Mr. Lorig would have to fulfill his CE requirements were his license rendered merely inactive, rather than terminated under FINRA Rule 1200(a)(2).

189.   In other words, upon recovering from his illness, Mr. Lorig could have easily re-established his licenses at JPMorgan *if* the Defendants actually still intended to employ him in some capacity, and thereby provide Mr. Lorig with the assistance he needed to have his licenses reinstated once he fulfilled his CE credits.

190.    Instead, the timing of the filing of the Form U5 virtually ensured that Mr. Lorig would not have sufficient time to affiliate with another firm and re-activate his licenses.  As discussed below, by refusing to correct the Form U5 or otherwise inform FINRA and other regulators that Mr. Lorig's licenses should only be considered inactive rather than terminated, JPMorgan ensured that Mr. Lorig's licenses would be irrevocably lost.

191.    As detailed further below, Mr. Loring *was* certified to return to work prior to the two-year mark's expiration.

192.    Although Mr. Lorig was in touch with JPMorgan's Human Resource department, and JPMorgan received frequent updates from Mr. Lorig's health care providers, other than quietly mailing the Form U5 to Mr. Lorig's New York residence, JPMorgan failed to ever specifically inform Mr. Lorig that he was in jeopardy of a full licensing loss.

193.    Instead, JPMorgan slowly released documents and information to Mr. Lorig, often only when pressed to do so.

194.    As alleged further below, even when Mr. Lorig was alerted to the danger that his licenses would expire, and arranged for his attorney to contact JPMorgan, the Defendants nevertheless deliberately allowed his licenses to lapse rather than preserve them or take any steps that would have enabled Mr. Lorig to re-activate them.

195.    Clearly, the Defendants intended to block Mr. Lorig from returning to work, and at the same time prevent other employers from hiring him, given that his licenses had been terminated during his disability leave, and allowed to expire after he was certified as eligible to return to work.

**Mr. Lorig Continues Treatment**

196.    Mr. Lorig continued treatment with Dr. Leven and Dr. Chapar.

197.    After a trip in the fall of 2014 to Florida to visit his sister, Mr. Lorig concluded that a move to Florida would aid his recovery and help him better manage his illness.

198.    In March 2015, Mr. Lorig began to be treated by Jeffrey Fabacher in Naples, Florida.

199.    On March 8, 2015, Mr. Lorig's CE expired.

200.    Defendants did not follow up with Mr. Lorig in any manner with respect to his CE requirements.

201.    Given that JPMorgan had already terminated Mr. Lorig's licenses, Defendants doubtlessly and spitefully believed there was no need to engage in any such follow up.

202.    Had JPMorgan not terminated Mr. Lorig's licenses in 2014, only by March 28, 2015 would the licenses merely have become inactive.

203.    Defendants also knew that the only reason Mr. Lorig's licenses would have become inactive resulted from his need to take disability leave to treat his illness.

204.    Mr. Lorig continued to be treated by Dr. Chapar, who in turn provided JPMorgan's disability carrier, Prudential Financial, with updates regarding Mr. Lorig's status on June 20, 2015 and February 10, 2016.

205.    On both occasions, Dr. Chapar stated that Mr. Lorig's disability remained severe, and that it was not possible at that time to determine when he could return to full-time work.

**Mr. Lorig Is Cleared by His Medical Team to Return to Work**

206.    Mr. Lorig continued being treated by Dr. Chapar and Dr. Fabacher, and his condition improved.

207.    By July 2016, Mr. Lorig was stable on medication, and working towards returning to work.

208.    On July 26, 2016, Mr. Lorig emailed Defendant Lee, JPMorgan Managing Director Greg Quental, and JPMorgan Vice President for Human Resources Gabrielle Longobardi and informed them that he was being released from disability by Dr. Fabacher, with a clearance to return to work when his disability ended on August 25, 2016.

209.    The next day, July 27, 2016, Mr. Lorig sent Mr. Quental by certified U.S. mail a letter (copying Ms. Longobardi and Mr. Lee by certified mail).

210.    Mr. Lorig's letter reiterated the above-information, and requested that JPMorgan send a return-to-work certification to Dr. Fabacher.

211.    Mr. Lorig also inquired where and when he should report back to work.

212.    JPMorgan Human Resources employee Jacqueline Sullivan emailed Mr. Lorig on July 27, 2016, advising Mr. Lorig that she could assist him in his return to work process.

213.    In a follow-up email sent later the same day, Ms. Sullivan listed the steps necessary for Mr. Lorig to return to work, explaining that Mr. Lorig's doctor would need to provide JPMorgan with a letter stating that Mr. Lorig could return to work along with any restrictions his return needed to be conditioned upon.

214.    Ms. Sullivan further stated that "once this has been received and processed we can confirm the logistical details for you to return."

215.    On July 29, 2016, Ms. Sullivan's supervisor, Jen Smith, emailed Mr. Lorig.

216.    Ms. Smith reminded Mr. Lorig to coordinate with his health care provider to submit the appropriate documentation to JPMorgan, and further stated *"[s]eparately, I have reached out to the firm's Corporate Employee Relations group to discuss the re-employment aspect and will be in touch with you early next week."*

217.   On August 5, 2016, Ms. Smith emailed Mr. Lorig and requested that Mr. Lorig schedule time on August 8, 2016 to speak with her on the phone.

218.   On August 8, 2016, Dr. Fabacher faxed JPMorgan a letter regarding Mr. Lorig.

219.   Dr. Fabacher explained that he had been treating Mr. Lorig since March 2, 2015, and that Mr. Lorig had moved to the Naples, FL area as part of a plan to assist his recovery from his illness that had resulted in his being unable to work since February 2014.

220.   Dr. Fabacher further stated *"[a]s a result of treatment and changes in lifestyle Michael has made significant improvement and in my opinion is now able to return to work with no restrictions."*

**The Defendants Inform Mr. Lorig That His Employment Will Be Terminated**

221.   The same day that Dr. Fabacher faxed the Defendants his clearance letter, August 8, 2016, Ms. Smith and Mr. Lorig spoke on the telephone.

222.   On that call, Ms. Smith told Mr. Lorig that he could not return to JPMorgan, and ***because there was allegedly no business for Mr. Lorig to return to***, his employment had been terminated following the conclusion of what Ms. Smith characterized to have been Mr. Lorig's FMLA leave.

223.   Ms. Smith also advised Mr. Lorig that his professional licenses had been terminated in September 2014.

224.   After these conversations, wherein Mr. Lorig inquired further as to his employment status and the status of his professional licenses, Ms. Smith emailed Mr. Lorig as a purported "follow-up", informing him that she was endeavoring to confirm the precise date in September 2014 that JPMorgan terminated Mr. Lorig's licenses.

225.    JPMorgan's Human Resources department would have known of the date in question, and reviewed Mr. Lorig's file to determine whether the license termination raised issues under Federal, New York State, and New York City laws, including anti-discrimination laws.

226.    Ms. Smith also advised Mr. Lorig that he had 1,482 RSUs that would vest in January 2017.

227.    The Defendants had never advised Mr. Lorig that his leave constituted FMLA leave, and had never provided or requested any FMLA-related paperwork.

228.    Nor had the Defendants discussed or explored any accommodations for Mr. Lorig for his return, as the FMLA (and the Americans with Disability Act, New York State and New York City human rights laws, and other statutes) requires.

229.    Mr. Lorig never specifically requested FMLA leave, nor was he mentally capable at that time to reference a specific statute, although the Defendants plainly could have initiated, disclosed, and handled FMLA-related matters.

230.    Furthermore, the Defendants never specifically discussed with Mr. Lorig any distinctions between FMLA and other statutes, including the ADA.  Mr. Lorig simply requested disability leave for depression, it was certified as required, and granted by both JPMorgan and Prudential.

231.    Ms. Smith's characterization also ignored key prior events.

232.    Mr. Lorig commenced his short-term disability leave in February 2014. Accordingly, twelve weeks of FMLA leave would have concluded in mid-May 2014.

233.    However, the Defendants did not file a Form U5 terminating Mr. Lorig's licenses until September 19, 2014.

234.    The Defendants' position, that Mr. Lorig was incapable of being accommodated in any fashion, or that there was no position he could hold at JPMorgan upon return commensurate with his experience and training, was baseless.

235.    Moreover, Ms. Smith's representation that there was "no business" for Mr. Lorig to return to was nonsensical.  Mr. Lorig had a robust book of business.  JPMorgan had simply and wrongly, unilaterally permanently transferred it to Mr. Woo.  Only now did Mr. Lorig learn that the transfer was a permanent transfer.

236.    In an August 12, 2016 email to Ms. Smith, Mr. Lorig informed her that he had not retired, and that – notwithstanding Ms. Smith's false reference to FMLA leave – he had consistently stated his intention to return to JPMorgan once he was released from disability.

237.    Ms. Smith insisted that, from the Defendants' standpoint, Mr. Lorig had retired.

238.    Perhaps recognizing their outrageous behavior and misconduct, Defendants, through Ms. Smith, communicated that JPMorgan's legal counsel was working on composing an agreement and release that, if executed, would forgive Mr. Lorig's remaining loans and vest his RSUs, and forwarded to Mr. Lorig contact information for Penny Domow, who served as in-house employment counsel for JPMorgan's brokerage group.

239.    In her email, Ms. Smith also stated that Mr. Lorig's employment with JPMorgan would not be officially terminated until an agreement between JPMorgan and Mr. Lorig was resolved.

**The Defendants Maliciously Allow Mr. Lorig's Professional Licenses to Expire**

240.    In a transparent effort to maintain the façade that Mr. Lorig had already retired, on August 12, 2016, in connection with Mr. Lorig's inquiries regarding his account payments and

COBRA coverage for his spouse, Ms. Smith directed Mr. Lorig to JPMorgan's "*As You Retire Guide*".

241.    Meanwhile, the clock on Mr. Lorig's professional licenses' expiry continued ticking.  Finally, on August 23, 2016, JPMorgan sent Mr. Lorig a draft agreement and release.

242.    JPMorgan's draft agreement offered to provide continued vesting of 1,482 RSUs and forgiveness of what JPMorgan wrongly claimed to be the remaining $587,070 loan balance.

243.    As explained above, JPMorgan had materially overstated the outstanding loan amounts; as of January 2017, the balance was no more than $240,320.57 plus no more than $53,000 in interest, based on the split commissions Mr. Lorig earned until at least June 2013.

244.    In exchange, JPMorgan, in its proposed agreement and release, required Mr. Lorig to voluntarily resign, waive jury and class claims, and release all claims, including compensation and those under the ADA, NLRA, ERISA, Title VII, ADEA, and FMLA, known and unknown.

245.    The proposed agreement further provided that it was conditioned upon Mr. Lorig not performing services in any capacity (including self-employment) for a financial services company.

246.    The draft agreement included garbled draft language rendering it uncertain whether Mr. Lorig would have been permitted to even work for a governmental, educational, or non-profit organization.  The language read **"*In order to qualify for FCE, from the date of termination of your employment through the applicable vesting date, you may not…. (2) work in your profession (whether or not for a Financial Services Company) provided that you work for a government, education or Not-for-Profit Organization....)*"**

247.    The draft agreement also prohibited Mr. Lorig either directly or indirectly soliciting any JPMCC or JPMCC-affiliated company customer, client, or prospective customer or client.

248.    As styled, the draft agreement's retiree certification requirement would have blocked Mr. Lorig from anything potentially competitive with the entirety of JPMCC's and its affiliated companies' activities, <u>regardless</u> of whether it required, for example, Series 7 or Series 3 licenses.

249.    For example, the draft agreement would have potentially precluded Mr. Lorig from working as a financial adviser on individual transactions, a Chief Financial Officer for a start-up venture, in private equity, for a family office, or in the real estate business.

250.    The Defendants were motivated to characterize Mr. Lorig's termination as a voluntarily-chosen resignation rather than as a reduction-in-force ("RIF").  Setting aside the fact that Defendants clearly understood their liability and exposure given their overt violations of Federal and State law, forcing Mr. Lorig to accept voluntary retirement with its concomitant release of all claims would be more cost-effective for JPMorgan than a RIF.

251.    Specifically, given Mr. Lorig's 37 years of service, treating his departure as a RIF would have required JPMorgan to pay him at least one year of compensation under JPMorgan's and Bear Stearns' heritage severance plan, forgive Mr. Lorig's loans, and vest his stock.

252.    However, treating his departure as a RIF would ***not*** have resulted in Mr. Lorig certifying to the Defendants that he would ***not*** engage in his chosen profession.  Had the departure been treated as a RIF, the only applicable covenants would have been limited to prohibiting Mr. Lorig from soliciting JPMorgan's employees or clients.

253.    Accordingly, the Defendants knowingly, recklessly or negligently placed Mr. Lorig under severe duress in pressuring him to sign the draft agreement and release, especially because the Defendants had already committed the illegal act of terminating Mr. Lorig's professional licenses.

254.     JPMorgan therefore knew, deliberately ignored, or recklessly or negligently disregarded the fact that Mr. Lorig would be unsuccessful in obtaining comparable new employment absent active professional licenses, and would need to explain why his "leave of absence" (the explanation JPMorgan had provided on the Form U5) had resulted in termination.

255.     Those factors, combined with Mr. Lorig's age and obvious need to manage and monitor his disability, placed severe obstacles in any attempt by Mr. Lorig to secure new employment or earn any type of living.

256.     Instead, armed with the leverage of its Form U5, and a ticking clock on Mr. Lorig's ability to re-associate his licenses, the Defendants attempted to force Mr. Lorig into an unwanted and unfair retirement "package" in the form of the draft agreement.

257.     The proposed retirement "package" failed to even offer Mr. Lorig trailing commissions on his book of business as is standard for retiring JPMorgan brokers.

258.     The Defendants' proposal – playing against the background of rapidly-expiring professional licenses – denied Mr. Lorig meaningful life and work options, denied him the opportunity to earn his livelihood, and would have prevented a potential new employer from buying out his remaining JPMorgan loan and RSU stock value.

259.     JPMorgan's proposal was entirely one-sided, unfair, discriminatory, wholly a product of JPMorgan's illegal prior conduct, and directly and proximately caused severe emotional distress to Mr. Lorig.

260.     Mr. Lorig expressed his concerns regarding the proposed agreement and release in an email to Ms. Smith sent on August 26, 2016.

261.     In that email, Mr. Lorig made clear that he had *not* "retired" from JPMorgan, but had instead been terminated without cause.

262.    Mr. Lorig also stated that he had never been previously advised that his leave was considered leave under the FMLA.

263.    Mr. Lorig further explained that because of JPMorgan having quietly terminated his professional licenses in September 2014, his ability to work down the remaining loan balance had been effectively eliminated, and, as a result of the termination, he now only had a few weeks to re-affiliate his licenses.

264.    Mr. Lorig's counsel attempted to resolve this dispute on Mr. Lorig's behalf, and made numerous proposals and inquiries to JPMorgan.

265.    The Defendants unreasonably stalled and delayed providing responses to Mr. Lorig's counsel's requests and inquiries.

266.    For example, JPMorgan inexplicably failed to provide Mr. Lorig's counsel a list of his expired state licenses until November 8, 2016.  The list was not provided until weeks had passed following the request.

267.    Mr. Lorig, through his counsel, made clear that he needed to have his licenses preserved.

268.    Through his counsel, Mr. Lorig specifically requested that JPMorgan file a Form U4 to reactivate Mr. Lorig's licenses while his return to work was being discussed, thereby halting the two-year suspension period that would result in his licenses being forfeited.

269.    Through his counsel, Mr. Lorig also communicated to the Defendants that the combination of the license termination together with the proposed agreement's non-compete provisions placed him in an impossible position with respect to future employment.

270.    Yet simultaneously during this period – September 2016 through his death on January 22, 2017 – JPMorgan stated that Mr. Lorig remained a JPMorgan employee.  As alleged

above, Ms. Smith confirmed in a September 20, 2016 email she sent Mr. Lorig that such was the case.

271.     The Defendants obstinately and unreasonably refused to accede to Mr. Lorig's reasonable request to file a Form U4.

272.     The Defendants did not provide Mr. Lorig or his counsel a coherent rationale explaining why JPMorgan unilaterally decided to terminate Mr. Lorig's licenses.

273.     JPMorgan unreasonably refused all of Mr. Lorig's reasonable requests to mitigate the harm caused by the improper termination.

274.     JPMorgan baselessly claimed to have never heard of any process to re-activate the licenses, and unreasonably refused to propose any alternative.

275.     The Defendants unreasonably and inexplicably refused to advise FINRA, the National Futures Association (NFA) or state authorities that it erred in terminating Mr. Lorig's license.

276.     The Defendants unreasonably and inexplicably refused to amend their September 2014 Form U5 filing to reflect that Mr. Lorig's licenses were simply inactive (for example, as a result of Mr. Lorig's need to complete CE credits).

277.     The Defendants also unreasonably refused to provide Mr. Lorig work he was qualified to do while he pursued re-affiliating his licenses (for example, providing strategic advice to other JPMorgan executives).

278.     Mr. Lorig was also fit for work, and capable - *if* he had still been licensed - of being employed at his usual level of achievement and expertise.

279.     Aware, or deliberately, recklessly or negligently ignorant of Mr. Lorig's age and medical condition, and also aware that Mr. Lorig consistently informed JPMorgan that he intended

to return to work upon his release from disability, JPMorgan instead schemed to oust Mr. Lorig and deprive him of benefits and opportunities to find new employment.

280.    Because the Defendants insisted that Mr. Lorig remained a JPMorgan employee, he was required to maintain his own personal trading accounts with JPMorgan under FINRA rules.

281.    Consequently, Mr. Lorig's ability to earn a living was further compromised because JPMorgan policies generally required Mr. Lorig to hold any investments for at least 30 days, restricted him from personally trading in certain financial instruments, prohibited day trading, restricted his ability to invest in derivatives, forwards, futures, options, warrants, commodities, and contracts-for-difference, prohibited investing in IPOs, and forced Mr. Lorig to pay JPMorgan trade transaction fees far exceeding those he would otherwise pay to a third-party broker.

282.    Hence not only was Mr. Lorig blocked from earning commissions from JPMorgan, he also had to *pay* expensive fees *to* JPMorgan for the limited amount of personal trading he could conduct through JPMorgan.

283.    In addition, because JPMorgan allowed Mr. Lorig's licenses to expire over his and his counsel's protests and requests, absent the Form U5 termination being expunged and his licenses becoming re-activated, Mr. Lorig would have been forced to prepare and sit for professional licensing examinations in multiple jurisdictions.   This further materially and harmfully impacted his ability to mitigate his damages, and obstructs his ability to secure comparable alternative employment.

**Defendants' Conduct Caused Mr. Lorig to Take His Own Life**

284.    Despondent over the prospect of watching his career prospects and personal self-worth evaporate, and facing the daunting task of finding work as a 66-year old with a history of mental illness and expired professional licenses, on January 22, 2017, Mr. Lorig took his own life.

285.    As Dr. Leven had observed in his August 10, 2014 letter, Mr. Lorig's profession was a "*core part of his identity*" and triggered the very existential crisis that had resulted in his need to take extended disability leave.

286.    The Defendants had been repeatedly advised of the history and severity of Mr. Lorig's condition, including multiple communications from Mr. Lorig's physicians that he frequently engaged in acute suicidal ideation, sometimes daily.

287.    Clearly the Defendants were obligated to make accommodations for Mr. Lorig's return, and to foster his successful transition back to work.

288.    Instead, likely relying on pressure they had imposed on Mr. Lorig when he was in the depths and throes of his illness, JPMorgan had: (a) informed him he had no business to return to; (b) allowed his licenses to terminate; (c) not informed him that his CE had lapsed; (d) demanded that he hold himself as having retired; (e) refused to take any steps towards enabling him to re-activate his licenses; and (f) demanded that he agree to non-compete terms that would have materially prohibited him from seeking gainful employment in his chosen profession anywhere.

289.    The Defendants did not engage in any interactive effort with Mr. Lorig with respect to a return to work, or make any effort to assign him work he was capable of doing while he attempted to re-activate his licenses and stabilize his position.  Instead, the Defendants brazenly lied to him about his leave having served as FMLA-qualified leave.

290.    The Defendants' combined efforts, at a time that they knew, deliberately ignored, or recklessly or negligently failed to know that he was emotionally fragile, directly and proximately caused Mr. Lorig's tragic, self-imposed, death.

## COUNT I
## Wrongful Death
## (All Defendants)

291.    Plaintiff incorporates the preceding paragraphs as alleged above.

292.    Each of the Defendants had a general duty to protect their employees, including Mr. Lorig, from reasonably foreseeable harms, in this case, the grave, obvious risk of self-inflicted harm resulting from the Defendants' decision to discriminate against Mr. Lorig, terminate his securities licenses, terminate his employment, and refusal to reinstate Mr. Lorig's securities licenses.

293.    At all relevant times, the Defendants knew, deliberately ignored, or were reckless or negligent in not knowing that Mr. Lorig suffered from a disability which specifically caused him to frequently engage in suicidal ideation.

294.    The Defendants knew, deliberately ignored, or recklessly or negligently disregarded that the conduct they were subjecting Mr. Lorig to, including harassing Mr. Lorig when he was attempting to treat his mental illness, terminating his employment, failing to provide him clear notice that Defendants were terminating his securities licenses, and refusing to reinstate such licenses, presented a clear and obvious risk of harm to Mr. Lorig, including, in particular, the risk that he would take his own life.

295.    The Defendants were routinely and systematically provided with updates on Mr. Lorig's disability, including reports from Mr. Lorig's health care professionals that expressly warned that Mr. Lorig suffered from severe clinical depression, and routinely contemplated suicide.

296.    The Defendants breached their duty to Mr. Lorig by exposing him to a clearly foreseeable and heightened risk of death and injury, deliberately and inexcusably causing and

exacerbating his condition by unjustly terminating his employment, unjustly terminating his securities licenses, and deliberately and spitefully refusing to reinstate the licenses, all the while insisting upon grossly unacceptable and unfair separation terms that effectively decimated Mr. Lorig's ability to earn a living.

297.    The Defendants' employees and agents interfaced with Mr. Lorig regarding his request to return to work and/or to reinstate his professional licenses, knowing, deliberately ignoring, or recklessly or negligently disregarding the fact that their actions placed Mr. Lorig at a heightened risk for mental anguish and suicide.

298.    The Defendants' knowledge, deliberate ignorance, or reckless disregard of Mr. Lorig's mental health issues, including, in particular, the risk of suicide, imposed a heightened duty on them to handle any termination or professional licensing issues in a safe or prudent manner.

299.    The Defendants' conduct increased and heightened Mr. Lorig's exposure to undue risk, because, well aware of his fragile and vulnerable condition, Defendants maliciously refused to grant him reasonable accommodations, or negotiate with Mr. Lorig or his representative in good faith.  Instead, Defendants allowed his professional licenses to expire, at a time when Defendants knew or should have known that the licenses' termination effectively eliminated Mr. Lorig's ability to be employed in his chosen profession.

300.    The Defendants continual intentional, systemic, policy, pattern and/or practice of intentionally discriminating against Mr. Lorig on the basis of Mr. Lorig's disability and age rendered it eminently foreseeable that he would take his own life.  Defendants, among other things intentionally, knowingly, recklessly, or negligently:

      a.  subjected Mr. Lorig to differing working conditions and compensation;

      b.  unilaterally permanently transferred Mr. Lorig's accounts to other of the Defendants' younger employees;

c. pressured Mr. Lorig to voluntarily retire, and insisted that any separation be treated as a "voluntarily retirement" rather than a reduction-in-force;

d. pressured Mr. Lorig to retire notwithstanding his stated intention to return to work once he had overcome his illness;

e. pressured Mr. Lorig to not commence long-term disability leave, and thereafter failing to provide him with statutorily-mandated notice under the FMLA;

f. deliberately and fully terminated Mr. Lorig's securities licenses with full knowledge that Mr. Lorig's disability prevented him from timely re-associating his licenses with a new firm;

g. failed to provide clear notice that JPMorgan had filed a Form U5 terminating Mr. Lorig's professional licenses;

h. inaccurately described the reasons for Mr. Lorig's absence on the Form U5;

i. refused to re-activate Mr. Lorig's professional licenses or take any steps to do so in the face of the licenses' imminent expiry;

j. deliberately and spitefully refused to take any steps enabling Mr. Lorig to re-activate his licenses once Mr. Lorig announced his intention to return to work;

k. terminated Mr. Lorig's employment; and

l. failed and refused to take reasonable and adequate steps to prevent and correct instances of discrimination.

301. The Defendants were on clear notice of the harms that threatened to befall Mr. Lorig

if his job and professional licenses were terminated absent, at a minimum, an adequate safety net.

302. The Defendants breached their duties in, *inter alia*, the following ways:

a. the Defendants failed to create a zone of safety for an employee with a known history of mental health problems, and specifically a history of suicidal ideation;

b. the Defendants deliberately, recklessly, or negligently inflicted emotional distress upon a known emotionally unstable person;

41

c.   the Defendants failed to notify Mr. Lorig in a reasonably safe and prudent manner of their decision to terminate his employment;

d.   the Defendants failed to notify Mr. Lorig in a reasonably safe and prudent manner of their decision to permanently transfer his accounts to other brokers;

e.   the Defendants failed to notify Mr. Lorig in a reasonably safe and prudent manner of their decision to terminate his securities licenses;

f.   the Defendants failed to act in a reasonably safe and prudent manner in allowing Mr. Lorig's professional licenses to expire notwithstanding reasonable requests by Mr. Lorig and his counsel that the Defendants take action to mitigate such harm; and

g.   the Defendants failed to have mental health professionals available to assist Mr. Lorig with his mental health problems after terminating his employment and/or allowing his professional licenses to expire.

303.   The Defendants' acts or omissions were a direct, proximate and legal cause of Mr. Lorig's death on January 22, 2017.

304.   As a further direct and proximate result of the Defendants' conduct, Mr. Lorig's Estate has incurred medical and funeral expenses, and will necessarily incur expenses in the settlement of the Estate in various and diverse amounts.

305.   Mr. Lorig's survivors and beneficiaries have suffered damages including loss of support and services, companionship, and mental pain and suffering.

306.   The Defendants' aforementioned acts, omissions and conduct were extreme, outrageous, malicious, or with the total disregard of Mr. Lorig's rights, and, therefore, the Defendants intended, knew, or deliberately, recklessly, or negligently ignored that their acts, omissions and conduct would injure Mr. Lorig.

307.   Because the Defendants knew or should have known of the risks posed by the conduct they subjected Mr. Lorig to, they had a duty to prevent such treatment and afford him the minimal decency of filing a Form U4 to reactivate Mr. Lorig's licenses while his return to work

was being discussed, thereby halting the two-year suspension period that would result in his licenses being forfeited.

308.    As a result of the Defendants' outrageous acts and omissions, which caused extreme pain, injury, and ultimately directly and proximately caused his death, the Defendants are liable for compensatory and punitive damages, including pecuniary and non-pecuniary damages.

**PRAYER FOR RELIEF**

Based on the foregoing, Plaintiff respectfully requests that it be awarded the following relief against the Defendants:

A.    An award of damages in an amount to be determined at trial, plus pre-judgment interest to compensate Mr. Lorig's Estate for all monetary and/or economic damages;

B.    An award of damages in an amount to be determined at trial, plus pre-judgment interest to compensate the Estate and Mr. Lorig's survivors for all non-monetary and compensatory damages, including without limitation, compensation for mental anguish, emotional distress, emotional pain and suffering, loss of society, loss of companionship, hedonic damages, and any other physical or mental injuries;

C.    An award of punitive damages in an amount to be determined at trial;

D.    An award of costs that Plaintiff incurred in this action, including but not limited to expert witness fees, as well as reasonable attorneys' fees to the fullest extent allowed by law; and

E.    Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues of fact and damages stated herein.


Dated: April 2, 2018
      New York, New York

                                **FLEISCHMAN LAW FIRM, PLLC**


By: _____
           Keith M. Fleischman, Esq.
           Joshua D. Glatter, Esq.
           June H. Park, Esq.
           565 Fifth Avenue, Seventh Floor
           New York, New York 10017
           Telephone: (212) 880-9571
           keith@fleischmanlawfirm.com
           jglatter@fleischmanlawfirm.com
           jpark@fleischmanlawfirm.com

           *Attorneys for Plaintiff*